IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MOHAMMED N. ALI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO.  4:17-cv-03179 |
| | § | |
| ACCENTURE, LLP, | § | |
| | § | |
| Defendant | § | |

**PLAINTIFF'S SWORN FIRST AMENDED COMPLAINT**

Plaintiff Mohammed N. Ali ("Mr. Ali" or "Plaintiff"), files his Sworn First Amended Complaint against Accenture, LLP ("Accenture," "the Company," or "Defendant"), showing as follows:

**SUMMARY**

1.    This case is brought under 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e.  Mr. Ali is Indian and Muslim.  Since 2007, he has worked in sales for Accenture.  Mr. Ali is a very good salesperson, with an objective track record to prove it.  Unfortunately, a recent manager of his, Tony Erickson, was prejudiced against him because of his race, national origin, and religion.

2.    Mr. Erickson discriminated against Mr. Ali based on his race, national origin, and religion by, *inter alia*: (a) paying him a lower base salary, but subjecting him to a vastly higher sales target, than his similarly situated non-Indian, non-Muslim coworkers; (b) demoting him, and only him, despite his objectively superior performance than most of his similarly situated non-Indian, non-Muslim coworkers; (c) giving him a zero percent 2016 annual bonus; (d) timing Mr. Ali's demotion so as to deny him substantial, six-figure annual and quarterly bonuses that he would otherwise have received; and (e) unilaterally partially or completely shorting Mr. Ali on sales credit on a number of his deals, so as to falsely deflate Mr. Ali's sales production for the year.

3.      The discrimination has caused Mr. Ali significant economic harm – in the neighborhood of seven-figures – in economic damages alone to date.

### THE PARTIES, JURISDICTION, AND VENUE

4.      The Plaintiff, Mr. Ali, is a natural person residing in Houston, Texas.  He is employed by Accenture located at 1301 Fannin Street #1900, Houston, TX 77002.  Mr. Ali has standing to file this lawsuit under the ADEA.

5.      Accenture is headquartered in Chicago, Illinois, is a citizen of Delaware, and has been served with process through its registered agent, Corporation Creations Network, Inc., 4265 San Felipe, Suite 1100, Houston, Texas 77027.  Accenture will be served with this amended complaint through its counsel of record.

6.      For each calendar year from 2015 to present, Accenture engaged in an industry affecting commerce and employed 500 or more employees for each working day in each of twenty or more calendar weeks.

7.      The Court has personal jurisdiction over Accenture based on both general and specific jurisdiction.  Personal jurisdiction is proper because Accenture has continuous and systematic contacts with and in the State of Texas, and the events or omissions giving rise to the Plaintiff's claims occurred in the State of Texas.

8.      Subject matter jurisdiction is proper because Mr. Ali brings claims under federal law, 42 U.S.C. § 1981 and Title VII.  The Court also has subject matter jurisdiction over this case based on diversity jurisdiction under 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount in controversy exceeds $75,000.00.

9.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Southern District of Texas, and the unlawful employment practices alleged in this case occurred in the Southern District of Texas.

## FACTUAL BACKGROUND[1]

### A.      Mr. Ali Has A Long History Of Sales Success At Accenture

10.      Mr. Ali is Indian and a Muslim, both of which are well known at Accenture.  He does not eat pork, or drink alcohol, and attends Friday prayers regularly.  He also has had conversations about his religion with Tony Erickson, a manager who, as explained  below, figures prominently in this case.  Mr. Ali has a BBA in MIS and an MBA from the University of Texas – Austin.   He has a long history of sales success in sophisticated business environments.

11.      Accenture is a multinational management consulting, technology, and outsourcing company.  Accenture employs more than 300,000 people around the world and has offices and operations in more than 200 cities globally, including Houston, Texas.  It is a Fortune Global 500 company.  In 2016, the company reported net revenues of $32.9 billion.  Accenture's current clients include more than 90 members of the Fortune Global 100 and more than three-quarters of the Fortune Global 500.

12.      In 2007, Mr. Ali joined Accenture in the position of Infrastructure Services Sales Lead.  He was hired to grow Accenture's Infrastructure Consulting services in its North America Energy practice.   Working with others, Mr. Ali restructured teams, conducted comprehensive

---

[1] Because the factual allegations set forth in this section are sworn to under oath, Plaintiff's Sworn First Amended Complaint is admissible evidence.  *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).  Note that Accenture asserts that the names of its customers are confidential.  While Mr. Ali does not concede that is entirely accurate (in many cases, Accenture's customers' names have been publically disclosed by Accenture itself), nevertheless he has redacted the names of customers in this amended complaint and in the exhibits to this amended complaint.  Mr. Ali will give Accenture a reasonable amount of time to move for a protective order that would then allow him to file a new pleading under seal, with the customers' names in it.

pipeline analyses, and created a playbook to simplify messaging to clients. Mr. Ali's efforts substantially assisted in meaningfully growing the business.

13. For example, sales in Fiscal Year 2008 (Accenture's Fiscal Years run from September 1 to August 31) within the Infrastructure Consulting services group in the North America Energy practice were approximately $20 million. By Fiscal Year 2013, they had grown to over $120 million. During this time, Mr. Ali regularly exceeded the sales targets given to him by Accenture, and earned substantial bonuses as a result. For example:

- In Fiscal Year 2010, Mr. Ali's sales target was approximately $7.5 million, yet he achieved approximately $19.4 million in sales. As a result of his sales, his income in 2010 year was $404,157.00.

- In Fiscal Year 2011, Mr. Ali's sales target was approximately $8.5 million, yet he achieved approximately $18 million in sales. As a result of his sales, his income in 2011 was $554,317.00.

- In Fiscal Year 2012, Mr. Ali's sales target was approximately $9.5 million, yet he achieved approximately $15 million in sales. As a result of his sales, his income in 2012 was $489,313.00.

14. In 2013, Mr. Ali became a Sales Capture Senior Manager. That year, he worked with Accenture's Energy practice and the Salesforce.com Oil and Gas vendor to launch Accenture's Salesforce.com practice in the North American Energy practice. This new service line went from a $5 million business in Fiscal Year 2015 to taking on a $100 million sales target in Fiscal Year 2017. Again, during this time, Mr. Ali regularly exceeded the sales targets given to him by Accenture, and earned substantial bonuses as a result. For example:

- In Fiscal Year 2013, Mr. Ali's sales target was approximately $10 million, yet he achieved approximately $17.2 million in sales. As a result of his sales, his income in 2012 was $495,313.00.

- In Fiscal Year 2014, Mr. Ali's sales target was approximately $11 million, yet he achieved approximately $15.2 million in sales. As a result of his sales, his income in 2014 was $470,366.00.

15.     In Fiscal Year 2015, Mr. Ali's father passed away, and he had other personal setbacks that dramatically affected his sales production.  As a result, in Fiscal Year 2015, Mr. Ali missed his sales target.

**B.     In Fiscal Year 2016, Mr. Ali's New Manager, Tony Erickson, Singled Him Out For, Among Other Things: (1) A Lower Base Salary Than His Similarly Situated Coworkers; (2) A Far Higher Sales Target; (3) A 0% Annual Bonus; And (4) An Undeserved Strategically Timed Demotion Designed To Deprive Mr. Ali Of An Annual Bonus Of Approximately $432,000.00 to $518,000.00 On A Single Deal That Closed Very Shortly After Undeserved The Demotion Took Effect**

16.     In August 2015, Mr. Ali moved into the Energy practice of Accenture North America Resources Group as a Sales Capture Senior Manager.  In this position, Mr. Ali was tasked with helping to revitalizing a core part of Accenture's business by working with North American Resources SAP leadership, client partners and Go-to-Market teams.  Mr. Ali's new immediate manager in this position was Tony Erickson, Energy Sales Lead.  Mr. Erickson also managed approximately ten to fifteen other Sales Capture Leads in the Energy Group.   Mr. Erickson is not Indian or Muslim.  All of the other Sales Capture Leads in the Energy Group are non-Indian, and non-Muslim.

17.     In Fiscal Year 2016, Mr. Erickson informed Mr. Ali that his base salary would be $187,200.00.  This was odd, because all of the other Sales Capture Leads in the Energy Group with Mr. Ali's tenure at Accenture had base salaries of approximately at least $215,000.00 or more that same Fiscal Year.  Mr. Ali was singled out for a lower base salary.

18.     In Fiscal Year 2016, Mr. Erickson informed Mr. Ali that his sales target would be $50 million for that Fiscal Year.  This too was odd, because the sales target of the other Sales Capture Leads in the Energy Group for that same Fiscal Year was $30 million.   It was also odd because the sales targets for the other Sales Capture Leads in the Energy Group for Fiscal Year 2015 had been $40 million or more, but those targets proved too high to meet, so Mr. Erickson

lowered them to $30 million for Fiscal Year 2016.  Despite all that, Mr. Erickson insisted on imposing a $50 million sales target on Mr. Ali for Fiscal Year 2016.

19.     Understandably, Mr. Ali told Mr. Erickson that he just wanted to be treated like the other Sales Capture Leads in the Energy Group in regard to his sales target.  Mr. Erickson refused to budge, and he continued with imposing a $50 million sales target on Mr. Ali for Fiscal Year 2016.  Mr. Ali was singled out for a higher sales target.

20.     Mr. Erickson justified his position concerning the $50 million sales target by telling Mr. Ali that he "wasn't going to be like Bernie Sanders and give handouts."  Mr. Erickson also looked at Mr. Ali in a glaring and threatening way, and told him, "I agree with all of Trump's views," at a time in the first half of 2016 when then candidate Donald Trump was calling for a total and complete shutdown of Muslims entering the United States.  This was immediately after Mr. Ali shared with Mr. Erickson that he was a lifelong Republican until the party took on such strong anti-Muslim views as part of Donald Trump's campaign.

21.     Mr. Erickson also claimed that imposing a $50 million sales target on Mr. Ali, and only a $30 million sales target on all the other Sales Capture Leads in the Energy Group, was justifiable because Mr. Ali was working in selling Next Generation Enterprise Resource Planning ("ERP"), which he claimed was the most mature and robust part of Accenture's business.  This justification fails because, among other reasons: (a) Application Outsourcing had a three year head start on Next Generation ERP, and was thus more mature and robust, yet John Yirak, another Sales Capture Lead in the Energy Group, who was assigned to sell Application Outsourcing, had a sales target of $30 million in Fiscal Year 2016; and (b) Applications Outsourcing is also more mature and robust than Next Generation ERP, yet Stu Miller, another Sales Capture Lead in the Energy

Group, who was assigned to sell Application Outsourcing, had a sales target of $30 million in Fiscal Year 2016.  Yirak and Miller are both white and non-Muslim.

22.      Despite Next Generation ERP being a new part of Accenture's ERP portfolio, Mr. Ali had significant sales success during Fiscal Year 2016.   Many multi-million deals he worked on closed.  Mr. Erickson, however, unilaterally partially or completely shorted Mr. Ali on sales credit on a number of his deals, so as to falsely deflate Mr. Ali's sales production for the year. Nevertheless, even putting those sales credits aside, and not counting them, Mr. Ali had credited sales in Fiscal Year 2016 of approximately $40.9 million.   This is the number reflected in Accenture's official records.  This sales production placed Mr. Ali in the top half of the Sales Capture Lead in the Energy Group for Fiscal Year 2016.  As Sam Paul, a Managing Director in the North America Energy Group texted Mr. Ali during Fiscal Year 2016, "I know you are one of our best."  (Ex. 1).

23.      Furthermore, on August 30, 2016, the second to last day of Fiscal Year 2016, Mr. Ali met face-to-face with Mr. Paul for approximately ninety minutes to discuss the go to market strategy in the Energy group for the upcoming Fiscal Year.  Mr. Paul was upbeat and optimist about Mr. Ali's ability to significantly continue to contribute to the group's success.  Mr. Paul's positive outlook about Mr. Ali, and his affirmation of Mr. Ali's abilities are reflected in the fact that Mr. Paul wanted Mr. Ali to "[h]ave conversations with CEOs, CFOs, and COOs," and to keep developing opportunities.  The conversation between Mr. Paul and Mr. Ali was summarized by Mr. Ali that same date (Ex. 2).

24.      Mr. Ali also showed unique initiative during Fiscal Year 2016.  He was the only Sales Capture Lead in the Energy Group to develop a targeted industry offering available from

Accenture's external website (Ex. 3).  The targeted offering has launched and is currently on Accenture's website.

25.     Mr. Erickson "rewarded" Mr. Ali for his sales success and initiative in Fiscal Year 2016 – and for being one of Accenture's "best," by demoting Mr. Ali to a position named, "Deal Execution Senior Manager."   This position supports Sales Capture Leads.  As such, it is a subordinate position to the role Mr. Ali had, with less authority, responsibility, autonomy, respect, and prestige.  It also has a dramatically lower bonus potential, such that persons employed as Deal Execution Senior Manager earn far less than persons employed as Sales Capture Leads.  Mr. Ali had managed employees in the equivalent position to Deal Execution Senior Managers for most of his tenure at Accenture.  As such, this was a demotion.  Mr. Erickson told Mr. Ali of the demotion on September 29, 2016, and the demotion took effect on December 2, 2016.

26.     So, when the non-Indian and non-Muslim Sales Capture Leads missed their $40+ million sales targets for Fiscal Year 2015, Mr. Erickson responded by lowering their sales target for Fiscal Year 2016 to $30 million.  But, when Mr. Ali missed his discriminatory $50 million sales target in Fiscal Year 2016, rather than lowering his sales target for the next year in line with the similarly-situated non-Indian and non-Muslim Sales Capture Leads, Mr. Erickson demoted him.

27.     This position Mr. Ali was demoted into had the same base salary, but the opportunity to earn bonuses is drastically – like 90% or more – lower.  None of the Sales Capture Lead in the Energy Group were demoted, including the many Sales Capture Leads whose sales production during 2016 was, by Accenture's own official records, lower than Mr. Ali's. Accordingly, Mr. Ali was singled out for a demotion.

28.     Mr. Erickson justified his decision to demote Mr. Ali by vaguely telling him that he lacked sales acumen and client interaction.  This is demonstrably false.  Mr. Ali's official sales production at Accenture reflect that his sales acumen and client interaction skills are both good, and better than most other employees in his same position (none of whom have been demoted).  *See supra*.  Examples of significant and successful client interactions where Mr. Ali demonstrated his sales acumen include, but are not limited to:

a.     ████.  On the ████ Cold Fusion project, Mr. Ali worked directly with ████, who is currently the VP of Architecture Platforms and Data, to make a sale of Accenture's Infrastructure Consulting Services of more than $25 million.

b.     ████████.  Mr. Ali worked with ████nn, client account lead, to sell Accenture services to the client, ████, in support of the PMO capabilities Accenture was providing ████ when they were spinning off ████ Mr. Ali positioned Accenture's capabilities in a Center of Excellence concept which was easy to understand and consume; this resulted in Accenture being able to staff over 100 resources and more than $20 million in sales.

c.     ████   On the ████ Vista Personal Coach, Mr. Ali originated the idea while proposing this solution to ████, ████ Downstream Vista Deputy Project Manager, after a lunch meeting.  As part of the sales process, Mr. Ali demonstrated to the client how this innovative approach could be delivered by Accenture and ████ would be able to save $10 million in the process.  In securing the sale, Mr. Ali traveled on multiple trips with the client to visit Accenture's delivery center in Manila and also escorted the client to Malaysia.  Accenture's fees were in excess of $20 million for this work.

d.     ████ Corporation.  In taking on the new role of the NA Energy NextGen ERP Sales Lead, Mr. Ali was asked to lead the firm's response to a competitive Request for Proposal for SAP services.  This pursuit already had heavy involvement from senior managing directors in the firm.  Having no prior SAP experience but over eight years of complex selling of Accenture's services, Mr. Ali worked closely with the deal team to differentiate the firm's capabilities as part of the response and as part of orals preparation.  The Accenture delivery team introduced Mr. Ali to the ████ Program Manager, ████ and the ████ Controller, ████, as the "puppet master pulling the strings from behind the scenes" to help the firm win the work.

e.     ████.  While still working the ████ deal, Mr. Ali received an urgent text from his NA Energy NextGen ERP Lead, Nikki Payne at 6:30 a.m. on the morning of July 14, 2016, seeking his assistance.  The deal team was struggling with messaging

to take to the client, pricing the deal, and getting internal approvals due to low profitability.  Mr. Ali was called into assist with this $17+ million deal because of his sales acumen, and the deal was successfully closed.

    f.    █████.  In 2017, Mr. Ali was asked to join a $146 million pursuit for the █████ Service Desk and Workspace RFP.  In this role, Mr. Ali worked with the sales lead, solution architects, client lead and others.  He demonstrated sales acumen above and beyond a Deal Execution Senior Manager by leading the Workspace team in developing the product roadmap, leading efforts to create the demos to take to the client, preparing the delivery team for orals, and traveling with the team to Rijswijk, Netherlands to be ready to present the Workspace product roadmap.

29.    Mr. Erickson claimed that Mr. Ali was a better fit for the Deal Execution Senior Manager role.  Interestingly, Mr. Ali was the only Indian and Muslim Sales Capture Lead in the Energy Group, but there are other Indian and Muslim Deal Execution Managers.

30.    The aforementioned █████ Corporation deal closed on September 29, 2016 – four weeks into Fiscal Year 2017.   It was a $54.9 million deal.  As noted above, on the very same day that the █████ Corporation deal closed, Mr. Erickson informed Mr. Ali that he was demoting him, effective December 2, 2016, and that he would not get any credit for the █████Corporation deal for Fiscal Year 2016 or 2017.

31.    Mr. Erickson had known for some time that the huge sale to █████ Corporation worth approximately $54.9 million was going to close at the beginning of the 2017 Fiscal Year. Mr. Ali had been approved to receive the maximum target *annual* bonus (two times the quarterly achievement bonus).  By strategically demoting Mr. Ali when he did, Mr. Erickson denied Mr. Ali the annual bonus for the 2017 Fiscal Year which, given the huge █████ deal, would have been at least in the range of approximately $432,000.00 to $518,000.00.[2]

---

[2] █████ was the first client to purchase the Next Generation ERP being developed by Accenture.  Due to delivery issues and software not available from the ERP vendor, SAP, █████ bought the ERP implementation in phases.  The first phase was to assess requirements, blueprint the solution and validate/revise overall estimate shared during the proposal.  Mr. Ali shared with Mr. Erickson that the delivery team was starting to take over the sales process since this was largely in delivery mode.  Mr. Ali continued to stay engaged with the delivery team, solution architects and leadership.  He offered suggestions to Mr. Erickson on what else he could do to help drive the sale.  Mr. Erickson was

32.     Accenture's Sales Plan provides that if a Sales Capture Lead is in his or her role at the end of a quarter in which a sale closes, then he or she is entitled to the *quarterly* bonus, if any, resulting from that sale.   As such, under Accenture's own Sales Plan, because the ████ Corporation deal closed in the first quarter of 2017, and Mr. Ali was in his position as Sales Capture Lead that entire quarter (which ended November 30, 2016), he was entitled to his quarterly bonus from the ████ Corporation $54.9 million deal.   That would have been: (a) $172,000.00 if one used a $30 million sales target and a $215,000.00 base salary to calculate it; (b) $150,000.00 if one used a $30 million sales target and a $187,200.00 base salary to calculate it; (c) $75,000.00 if one used a $50 million sales target and a $215,000.00 base salary to calculate it; and (d) $65,000.00 if one used a $50 million sales target and a $187,200.00 base salary to calculate it.   Accenture, however, paid Mr. Ali no quarterly bonus at all for the first quarter of 2017.   Mr. Erickson gave no reason for this.

33.     Around the same time that he demoted Mr. Ali into a "Deals Execution Senior Manager," position, Mr. Erickson re-hired a white, non-Muslim former employee of Accenture named Dane Harris, and placed him into the Sales Capture Lead position in the Energy Group that Mr. Ali had been in before his demotion.   Mr. Harris had previously been employed at Accenture in the Deals Execution position that Mr. Ali was demoted into.   Mr. Harris attempted to call on the same clients Mr. Ali was working on meeting with to sell Next Generation ERP; specifically, ████

---

more focused on Mr. Ali selling at other accounts; for example, work selling ████ ERP at ████ and supporting SAP deals at ████ and ████.   Mr. Ali took the direction Mr. Erickson gave Mr. Ali as his supervisor.  Not once did Mr. Erickson inform Mr. Ali he needed to have a more visible presence at ████.  It is not uncommon for Sales Leads to work multiple deals simultaneously and play a lesser role once there is a large account team working on a prior phase who is also working closely with the client in drafting the scope of subsequent phases.  It is between the Sales Lead and his/her Sales Leadership to determine the amount of participation/involvement needed by the Sales Lead to earn sales credit.  Until September 29, 2016 – the very day the ████ deal had already closed – Mr. Erickson gave no indication that Mr. Ali's sales credit for the ████ deal was in jeopardy.  Based on previous experience working multiple deals and knowing how Sales Leadership give sales credit to the team, Mr. Ali had no reason to believe his performance would lead to 0% credit on the ████ deal, and every reason to believe he would receive full credit.

█████ and █████.  These were key clients as part of the Next Generation ERP sales plan Mr.

Ali shared with Mr. Erickson.  When an Accenture employee, Drew Wallace, e-mailed Mr. Ali

and Mr. Erickson that he would connect Mr. Ali to the CIO at █████, Mr. Erickson quickly

responded to the note that Mr. Wallace should connect Mr. Harris to the prospective client instead

of Mr. Ali (Ex. 4).  Upon information and belief, neither Mr. Harris, nor any other Sales Capture

Lead in Mr. Erickson's organization was given a $50 million sales target for Fiscal Year 2017.

34.     Based on his credited production of $40.9 million, and using the $50 million sales

target that Mr. Erickson imposed on him, under his written sales plan, for Fiscal Year 2016, Mr.

Ali was entitled to: (a) 20% of his base salary (*i.e.*, $37,440.00) in quarterly achievement bonus;

and (b) another amount between 0% and 100% of $37,440.00 as an annual bonus, based on

management discretion as decided by Mr. Erickson.  Although "target" (*e.g.* the Company-

approved norm) for the annual bonus component was 50% (*i.e.*, $18,720.00), Mr. Erickson

exercised his discretion to award Mr. Ali 0% for his annual bonus for Fiscal Year 2016.  Mr.

Erickson singled out Mr. Ali for a 0% annual bonus.  Other white, non-Muslim similarly situated

Sales Capture Leads received annual bonuses from Mr. Erickson of more than 0%.

35.     Mr. Ali has suffered significant damages as a result of Mr. Erickson's racist and

illegal discrimination against him.  For example:

    a.   Lost Base Salary in Fiscal Year 2016: $28,000.00.  Mr. Ali lost at least $28,000.00 just in Fiscal Year 2016 as a result of being discriminated against in his base salary by being paid a $187,200.00 base salary instead of a $215,000.00 base salary (which is at least what it would have been, if not more, absent discrimination).  *See supra*.

    b.   Quarterly Achievement Bonus and Annual Bonus Lost in Fiscal Year 2016 Between $206,310.00 and $381,810.00 Because Of Being Given The $50 Million Sales Target, Rather Than A $30 Million Target Like Everyone Else:

       •   Using Actual Base Salary.  Had Mr. Ali been given a $30 million sales target for Fiscal Year 2016, like all the other Sales Capture Leads in the Energy Group, rather than a $50 million sales target, then using his official

production number of $40.9 million and his actual base salary of $187,200.00, his quarterly achievement bonus would have been $121,875.00 (rather than $37,440.00, a difference of $84,435.00) and his annual bonus for Fiscal Year 2016 would have been $121,875.00 (instead of nothing) if one simply assumed he would have received the "target" annual bonus (if one assumed he received an above-target annual bonus then it would be up to $243,750.00).

• Using $215,000.00 Base Salary (which is at least what it would have been, if not more, absent discrimination). Had Mr. Ali been given a $30 million sales target for Fiscal Year 2016, like all the other Sales Capture Leads in the Energy Group, rather than a $50 million sales target, then using his official production number of $40.9 million and a non-discriminatory base salary of $215,000.00, his quarterly achievement bonus would have been $139,750.00 (rather than $37,440.00, a difference of $102,310.00) and his annual bonus for Fiscal Year 2016 would have been $139,750.00 (instead of nothing) if one simply assumed he would have received the "target" annual bonus (if one assumed he received an above-target annual bonus then it would be up to $279,500.00).

c. Demotion. The demotion Mr. Ali suffered effective December 1, 2016, likely damaged Mr. Ali in the pro rata amount of $350,000.00 on an annualized basis, because the opportunity to earn bonus in that role was dramatically lower than when he was in the Sales Capture Lead position.

d. Lost 2017 Annual Bonus on ███████ Corporation: Approximately $432,000.00 to $518,000.00. *See supra.*

e. Lost Quarterly First Quarter 2017 Bonus on ███████ Corporation: Approximately $65,000.00 to $172,000.00. *See supra.*

f. Unilaterally Partially or Completely shorting Mr. Ali on Sales Credit on a Number of Deals During Fiscal Year 2016: Approximately $4.1 million in sales were not credited to Mr. Ali, which affected his Fiscal Year 2016 compensation by approximately $14,000.00 using the discriminatory $50 million sales target he was given for 2016, and $46,850.00 to $93,750.00 using a $30 million sales target for 2016 that all the other Sales Capture Leads in the Energy Group were given.

36. On January 12, 2017, Mr. Ali filed an EEOC Charge of Discrimination. Subsequently: (a) Manish (Manny) Pajwani, Senior Managing Director within Accenture, who runs the Technology Consulting business for North America Resources, and knows that Mr. Ali is indeed a talented and highly skilled salesperson, wanted to recruit Mr. Ali to his group to sell offering within North American Resources; and (b) Luis Galito, Managing Director of Resources

Operating Group, offered to bring Mr. Ali into his group as the Southwest Region Cloud First Application Sales Lead over two other Sales Leads, with responsibility to help grow his business in his group from $100MM to $150MM+ in Fiscal Year 2019.  Mr. Pajwani and Mr. Galito's recruitment of Mr. Ali further demonstrates that Mr. Erickson's eleventh-hour attacks on Mr. Ali at the end of Fiscal Year 2016 are baseless, pretextual, fabrications.   Indeed, on July 24, 2017, Mr. Ali received notice that he had been offered (and he accepted) the position of Southwest Region Cloud First Application Sales Lead, conclusively confirming that the assertion that he lacked sales acumen sufficient to be a Sales Lead was a pretext for discrimination.

C.     **Mr. Ali's Lawyer Sent Accenture A Draft Of This Lawsuit, and Draft Discovery Requests, And Within Six Weeks Both Tony Erickson And His Boss Were On There Way Out Of Accenture**

37.     On July 20, 2017, Mr. Ali's lawyer sent Accenture's outside counsel a draft of this lawsuit by e-mail.  The draft was, much like this actual lawsuit, very detailed.  On August 3, 2017, Mr. Ali's lawyer sent Accenture's outside counsel a draft of Interrogatories, Requests for Production, and Requests for Admissions he would be sending Accenture after filing the lawsuit. The requests were very detailed and sought a wide variety of relevant information that would indicate discrimination against Mr. Ali based on his race, national origin, and religion.

38.     On August 30, 2017, Accenture announced that Mr. Erickson's immediate manager, Kelly Gallant, Managing Director, North America Resources Sales, had decided to retire from the Company effective January 2018.   About a week later, in early September 2017, Accenture announced that Mr. Erickson was leaving the Company too.   The announcement suggested that the Company had involuntarily terminated Mr. Erickson's employment.

## RACE, NATIONAL ORIGIN, AND RELIGIOUS DISCRIMINATION CLAIMS

**A.**     **Law**

39.     Section 1981 prohibits race discrimination, which includes Indians within that ambit.  Title VII prohibits national origin discrimination and religious discrimination.  For purposes of Section 1981, Indian is a "race," and for purposes of Title VII it is a "national origin." *See Jatoi v. Hurst-Euless Bedford Hosp. Authority*, 807 F.2d 1214, 1218 (5th Cir. 1987); *Banker v. Time Chem., Inc.*, 579 F. Supp. 1183, 1186 (N.D. Ill. 1983).

40.     In the absence of direct evidence of discrimination, Section 1981 and Title VII cases are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis).  First, the plaintiff must establish a *prima facie* case of discrimination, "which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group."  *McCoy*, 492 F.3d at 556; *Caldwell v. Univ. of Houston Sys.*, 520 Fed. Appx. 289, 293 (5th Cir. 2013); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).  If the plaintiff makes a *prima facie* showing, the employer must then provide a legitimate, non-discriminatory reason for the employment action. *Byers*, 209 F.3d at 425. "The burden on the employer at this stage is one of production, not persuasion; it can involve no credibility assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quotations and citations omitted).

41.     If the employer provides a legitimate, non-discriminatory reason, "the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Id*. (citation omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 249 (1981)).

**B.     Analysis**

**1.     Mr. Ali Easily Makes Out A *Prima Facie* Case Of Discrimination**

42.     Mr. Ali easily makes out a *prima facie* case of discrimination as to all of his claims. First, Mr. Ali is a member of three protected groups – he is an Indian (race and national origin protection) and a Muslim (religious protection).

43.     Second, Mr. Ali was qualified for the position at issue, meaning the Sales Capture Lead position.  Indeed, Mr. Ali's sales production in Fiscal Year 2016 was in the top 50% of all Sales Capture Leads in the Energy Group headed by Mr. Erickson.  *See supra*.

44.     Third, Mr. Ali suffered multiple adverse employment actions, to wit: (a) he was paid a lower base salary, but given a higher sales target, than similarly situated non-Indian and non-Muslim Sales Capture Leads in the Energy Group headed by Mr. Erickson; (b) he was demoted by Mr. Erickson despite his objectively superior performance than his similarly situated non-Indian, non-Muslim Sales Capture Leads in the Energy Group; (c) he received a zero percent annual bonus from Mr. Erickson; (d) Mr. Erickson timed Mr. Ali's demotion so as to rob him of a large annual bonus on ███ Corporation that he would otherwise have received; (e) not paying

Mr. Ali on a quarterly bonus he earned for the first quarter of Fiscal Year 2017 of between $65,000.00 and $172,000.00; and (f) Mr. Erickson unilaterally partially or completely shorted Mr. Ali on sales credit on a number of his deals, so as to falsely deflate Mr. Ali's sales production for the year.

45.     Finally, Mr. Ali was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.  Specifically: (a) he was paid a lower base salary, but given a higher sales target, than non-Indian and non-Muslim Sales Capture Leads in the Energy Group headed by Mr. Erickson; (b) at approximately the same time he demoted Mr. Ali into a "Deals Execution Senior Manager," position, Mr. Erickson re-hired a white, non-Muslim former employee of Accenture named Dane Harris, and placed him into the Sales Capture Lead position in the Energy Group that Mr. Ali had been in before his demotion; (c) other similarly situated Sales Capture Leads in the Energy Group (all of whom are non-Indian and non-Muslim) did not receive zero percent annual bonuses; (d) other similarly situated Sales Capture Leads in the Energy Group (all of whom are non-Indian and non-Muslim) were not demoted at all, much less strategically demoted at a specific time so as to deny them annual and quarterly bonuses they otherwise would have been entitled to under their Sales Plan; and (e) Mr. Erickson did not partially or completely short other similarly situated Sales Capture Leads in the Energy Group (all of whom are non-Indian and non-Muslim) on sales credit during Fiscal Year 2016.

## 2.     Accenture's Articulated Reasons For Taking The Challenged Employment Actions

46.     Because Mr. Ali has made out a *prima facie* showing on multiple adverse employment actions, Accenture must now provide a legitimate, non-discriminatory reason for each of the challenged employment actions.

47.     Mr. Erickson claimed that Mr. Ali's lower base salary was because he could not give him a raise to earn what similarly-situated Sales Capture Leads were paid (approximately at least $215,000.00 or more).

48.     Mr. Erickson claimed Mr. Ali's sales target was $50 million, rather than $30 million like all the other Sales Capture Leads in the Energy group, because Mr. Ali was working in selling Next Generation ERP, which he claimed was the most mature and robust part of Accenture's business.  Mr. Erickson also justified his position concerning the $50 million sales target by telling Mr. Ali that he "wasn't going to be like Bernie Sanders and give handouts."

49.     Mr. Erickson claimed he was demoting Mr. Ali effective December 1, 2016, and giving him a zero percent annual bonus for Fiscal Year 2016 because of lack of sales acumen and client interaction.

50.     Mr. Erickson's reason for not giving Mr. Ali any sales credit (or annual bonus) based on ████ Corporation deal closing after September 1, 2016, was that Mr. Ali had been demoted out of his Sales Capture Lead position by the time the deal closed, so he was alleged not entitled to any sales credit (or bonus) from the sale.   Mr. Erickson gave Mr. Ali no reason for not giving him a quarterly bonus for the first quarter of Fiscal Year 2017 during which time the ████ Corporation deal closed and Mr. Ali was still in the Sales Capture Lead position.

51.     Mr. Erickson gave no reasons for unilaterally partially or completely shorting Mr. Ali on sales credit on a number of his deals, so as to falsely deflate Mr. Ali's sales production for the year.

3.      **Mr. Ali Has Substantial Proof Of Pretext And Discrimination *Vel Non* As to Each Challenged Adverse Employment Action**

52.     Where, as here, the plaintiff makes out a *prima facie* case of discrimination, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment

decision.   *See Baker,* 430 F.3d at 754-55. After the employer does so, "any presumption of [discrimination] drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for [discrimination]."   *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

53.     In this case, Mr. Ali can demonstrate that each of Accenture's given reasons for each of the above-mentioned adverse employment actions are pretexts for discrimination.

54.     Mr. Erickson claimed that Mr. Ali's lower base salary was because he could not give him a raise to earn what similarly-situated Sales Capture Leads were paid (approximately at least $215,000.00 or more).  But, he has given raises before.  And, the plain evidence of disparate treatment as compared to the other similarly-situated non-Indian and non-Muslim Sales Capture Leads in the Energy Group headed by Mr. Erickson is sufficient evidence of pretext.  *See, e.g.*, *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 861-62 (5th Cir. 2010) (evidence of disparate treatment of the plaintiff, as compared to other similarly situated employees, was sufficient to establish pretext and support the jury's verdict in the plaintiff's favor); *see also Wheat v. Fl. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 711 (5th Cir. 2016) (summary judgment improper given evidence of disparate treatment of plaintiff under nearly identical circumstances).

55.     Mr. Erickson claimed Mr. Ali's sales target was $50 million, rather than $30 million like all the other Sales Capture Leads in the Energy group, because Mr. Ali was working in selling Next Generation ERP, which he claimed was the most mature and robust part of Accenture's business.  This justification fails because, among other reasons: (a) Application Outsourcing had a three year head start on Next Generation ERP, and was thus more mature and robust, yet John Yirak, another Sales Capture Lead in the Energy Group, who was assigned to sell Application Outsourcing, had a sales target of $30 million in Fiscal Year 2016; and (b) Applications

Outsourcing is also more mature and robust than Next Generation ERP, yet Stu Miller, another Sales Capture Lead in the Energy Group, who was assigned to sell Applications Outsourcing, had a sales target of $30 million in Fiscal Year 2016.  Yirak and Miller are both white and non-Muslim. *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original).  In addition, this justification also fails because, upon information and belief, other than Mr. Ali, no Sales Capture Lead in the Energy Group ever had as high as a $50 million quota in fiscal years other than 2016, even those responsible for focusing on selling Next Generation ERP.  For example, upon information and belief, Dane Harris was not given a $50 million quota when he replaced Mr. Ali in Fiscal Year 2017 and was selling Next Generation ERP.  This is compelling evidence of disparate treatment. *See, e.g.*, *Carmona*, 604 F.3d at 861-62 (evidence of disparate treatment of the plaintiff, as compared to other similarly situated employees, was sufficient to establish pretext and support the jury's verdict in the plaintiff's favor); *see also Wheat*, 811 F.3d at 711 (summary judgment improper given evidence of disparate treatment of plaintiff under nearly identical circumstances); *Lee v. Kan. City S. Ry. Co.,* 574 F.3d 253, 261-62 (5th Cir. 2009) (finding plaintiff made out *prima facie* case of disparate treatment in a discrimination case and reversing summary judgment that the district court had entered for the employer).

56.     Mr. Erickson claimed he was demoting Mr. Ali from a Sales Capture Lead position to a Deal Execution Senior Manager position, and giving him a zero percent annual bonus, because of lack of sales acumen and client interaction.  These reasons are pretextual because, among other

reasons, Mr. Ali's official sales production at Accenture reflect that his sales acumen and client interaction skills are both good, and better than most other non-Indian and non-Muslim employees in his same position in the Energy group, none of whom have been demoted.  In other words, Mr. Ali outperformed at least 50% of his non-Indian, non-Muslim peers in the Energy group, yet he was demoted and the lower performing non-Indian, non-Muslims were not.  *See supra*.  Mr. Ali was the only Indian and Muslim Sales Capture Lead in the Energy Group, but there are other Indian and Muslim Deal Execution Managers.  On these facts, Mr. Erickson's assertion that Mr. Ali was a better fit for the Deal Execution Senior Manager role is consistent with a stereotypical view of where Indians/Muslims best fit within Accenture in his mind.

57.     Moreover, contrary to Mr. Erickson's claims that Mr. Ali lacked sales acumen and client interaction, Sam Paul, a Managing Director in the North America Energy Group texted Mr. Ali during Fiscal Year 2016, "I know you are one of our best," and planned to utilize Mr. Ali's proven skills and abilities during Fiscal Year 2017 (Exs. 1 and 2).  *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000) (affirming verdict for plaintiff in a discrimination case and relying on testimony from a coworker that, contrary to the employer's claim, "Russell did an "excellent" job of keeping the facility in federal compliance.").

58.     Similarly, as noted previously, during 2017: (a) Manish (Manny) Pajwani, Senior Managing Director within Accenture, who runs the Technology Consulting business for North America Resources, and knows that Mr. Ali is indeed a talented and highly skilled salesperson, wanted to recruit Mr. Ali to his group to sell offering within North American Resources; and (b) Luis Galito, Managing Director of Resources Operating Group, offered to bring Mr. Ali into his group as the Southwest Region Cloud First Application Sales Lead over two other Sales Leads, with responsibility to help grow his business in his group from $100MM to $150MM+ in Fiscal

Year 2019.  Mr. Pajwani and Mr. Galito's recruitment of Mr. Ali further demonstrates that Mr. Erickson's eleventh-hour attacks on Mr. Ali at the end of Fiscal Year 2016 are baseless fabrications about Mr. Ali's sales acumen and client interaction.   So does the fact that others in high places at Accenture have sang Mr. Ali's praises.  Specifically, Bob Jordan, an Infrastructure Cloud Sales Lead, and Jurgen Jurss, Managing Director for Accenture's Europe, Africa & Latin America Resources region, both gave Mr. Ali high praise on his sales acumen and client interaction (Exs. 5 and 6).  And, on July 24, 2017, Mr. Ali received notice that he had been offered (and he accepted) the position of Southwest Region Cloud First Application Sales Lead, conclusively confirming that the assertion that he lacked sales acumen sufficient to be a Sales Lead was a pretext for discrimination.

59.     Mr. Erickson's reason for not giving Mr. Ali any sales credit (or annual bonus) based on the ████ Corporation deal closing after September 1, 2016, was that Mr. Ali had been demoted out of his Sales Capture Lead position before the end of Fiscal Year 2017, so he was not entitled to any sales credit (or bonus) from the sale.  Because the demotion itself is discriminatory, this action is merely a functional consequence of that discrimination.  *See, e.g., Vaughn v. Edel*, 918 F.2d 517 (5th Cir. 1990) (effects of prior discrimination cannot lawfully be used by employer to justify a new adverse employment action against an employee).

60.     As to the quarterly bonus for the first quarter of 2017, Accenture's Sales Plan provides that if a Sales Capture Lead is in his or her role at the end of a quarter in which a sale closes, then he or she is entitled to the quarterly bonus, if any, resulting from that sale.  As such, under Accenture's own Sales Plan, because the ████ Corporation deal closed in the first quarter of 2017, and Mr. Ali was in his position as Sales Capture Lead that entire quarter (which ended November 30, 2016), he was entitled to his quarterly bonus from the ████ Corporation $54.9

million deal.  That would have been between $65,000.00 and $172,000.00.  *See supra*.  Accenture, however, paid Mr. Ali no quarterly bonus at all for the first quarter of 2017.   Mr. Erickson gave no reason for this.

61.     Mr. Erickson gave no reasons for unilaterally partially or completely shorting Mr. Ali on sales credit on a number of his deals, so as to falsely deflate Mr. Ali's sales production for the year.  So, there is nothing for Mr. Ali to rebut.

62.     In addition to substantial evidence of pretext, Mr. Ali has other evidence to prove discrimination *vel non*.  First, Mr. Erickson made a statement made while glaring at Mr. Ali, that, "I agree with all of Trump's views," at a time in the first half of 2016 when then candidate Trump was calling for a total and complete shutdown of Muslims entering the United States.  Given that Mr. Ali is an Indian and a Muslim, and Mr. Erickson knew that, this statement can reasonably be interpreted as a discriminatory statement made towards Mr. Ali on the basis of his race, national origin, and religion.  In the case of *Goudeau v. National Oilwell Varco, L.P.*, the U.S. Court of Appeals for the Fifth Circuit addressed such remarks in a discrimination case, and held that such remarks are probative of unlawful discrimination so long as they were made by a decisionmaker and were related to the prohibited characteristic upon which the plaintiff alleged discrimination. 793 F.3d 470 (5th Cir. 2015).  *See also Jackson v. Host Intern., Inc.*, Nos. 09–51137, 10–50026, 2011 WL 2119644, at *3 (5th Cir. Feb. 1, 2011) (discriminatory remarks supported plaintiff's verdict); *Cf. Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005) (evidence of comments reflecting stereotypes, along with other circumstantial evidence, required the reversal of summary judgment for the employer in a discrimination case); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003) ("After *Reeves,* however, so long as remarks are not the only evidence of pretext, they are probative of discriminatory intent."); *Russell v. McKinney Hosp.*

*Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (discriminatory remarks supported jury's verdict in plaintiff's favor in a discrimination case).

63.     Second, Accenture's Position Statement to the EEOC in this matter contained a myriad of inaccurate assertions, including but not limited to:

  a. Incorrectly claiming that Mr. Erickson told Mr. Ali that he had been ineligible to receive a raise based on his 2015 performance;

  b. Incorrectly claiming that Mr. Erickson had beneficently given Mr. Ali sales credit on deals that he actually was not entitled to receive sales credit on;

  c. Incorrectly asserting that Mr. Erickson had reviewed Mr. Ali's fiscal year 2016 written performance review with him on September 29, 2016 – in fact, Mr. Ali had never seen if before he saw it attached to the Position Statement Accenture submitted to the EEOC in June 2017;

  d. Incorrectly asserting that Mr. Erickson had told Mr. Ali many times prior to October 3, 2016, that he needed to be meeting with clients and leading the deals;

  e. Incorrectly claiming that Mr. Ali acknowledged that Mr. Erickson had been "generous in some respects" during an October 18, 2016 meeting;

  f. Incorrectly repeatedly asserting that the Sales Achievement Bonus plan contained explicit language that provided that a Sales Capture Lead was only eligible for sales credit on deals for which he managed the opportunity sales pursuit and closed opportunities; and

  g. Inaccurately and falsely asserting that Mr. Erickson was not aware of Mr. Ali's national origin or religion when he made the decision at issue in this case.

64.     These inaccurate statements are additional proof of pretext, and illegal discrimination *vel non*. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 239-40 (5th Cir. 2015) (holding that a jury may view "erroneous statements in [an] EEOC position statement" as "circumstantial evidence of discrimination."); *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013) (affirming a jury verdict in an age discrimination case partially because "[a]t trial, Miller presented undisputed evidence that Raytheon made erroneous statements in its EEOC position statement."); *McInnis v. Alamo Comm. College Dist.*, 207 F.3d 276, 283 (5th Cir. 2000) (reversing

summary judgment that had been entered for the employer in a discrimination case partially because the employer's report to the EEOC "contained false statements . . . .").

65. Third, Accenture's claims that Mr. Ali underperformed throughout Fiscal Year 2016 are undermined by the fact that at no point prior to August 25, 2016 – just six days before the end of the fiscal year – did Mr. Erickson express any dissatisfaction or concerns about Mr. Ali's performance. Even Accenture admits this. As it stated in its Position Statement: "Toward the end of the fiscal year, on August 25, 2016, Mr. Erickson *began* having conversations with Mr. Ali to discuss his performance issues." (italics added). This suggests that, consistent with Mr. Ali's contentions in this case, his performance was good throughout the 2016 fiscal year, and Mr. Erickson only belatedly pretextually contended otherwise in order to try to justify his decisions to demote Mr. Ali, and deny him bonuses. *See Lloyd v. Georgia Gulf Corp.*, 961 F.2d 1190, 1195 (5th Cir. 1992) (". . . when an employer's stated motivation for an adverse employment decision involves the employee's performance, but there is no supporting documentation, a jury can reasonably infer pretext.") (citing *Walther v. Lone Star Gas Co*., 952 F.2d 119, 124 (5th Cir. 1992); *Hansard v. Pepsi-Cola Metropolitan Bottling Co*., 865 F.2d 1461, 1465 (5th Cir. 1989) ("where the only evidence of intent is oral testimony, a jury could always choose to discredit it.") (quoting *Bhaya v. Westinghouse Elec. Corp*., 832 F.2d 258, 262 (3d Cir. 1987); *Guthrie v. J.C. Penney Co*., 803 F.2d 202, 207 (5th Cir. 1986)). *See also Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (holding that summary judgment was not proper in a discrimination case where the employer had no contemporaneous documentation to support its assertions of poor performance against the employee, and instead relied solely on after-the-fact documentation and testimony from interested witnesses); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d at 239-40 (holding that the lack of contemporaneous documentation to support claims of poor

performance may in appropriate cases be evidence of pretext, and reversing a summary judgment that had been entered for the employer by the district court).

66.     Fourth, Accenture has a pattern and practice of discriminating against Indians.  Last year, Accenture settled a national origin discrimination class action brought by a former software engineer from India who claimed he and a class of Indians were intentionally paid significantly less than Americans were paid, with Accenture agreeing to pay up to $500,000.  *See Elton Kent v. Accenture PLC et al*., Case No. 161463/2015, in the Supreme Court of the State of New York. Accenture has a pattern and practice of placing Indians in lower level, lower paying, roles, as compared to whites and non-Indians.   Statistics will bear this out, and provide further proof of pretext. *See Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir. 1992) (per curiam) ("We have recognized that gross statistical disparities ... may be probative of discriminatory intent, motive or purpose"); *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1137 (5th Cir. 1983) ("An employee may use statistics to show that an employer's justification for a discriminatory act is pretext.").

67.     In sum, the evidence amply demonstrates that Accenture's given reasons for the challenged adverse employment actions in this case are pretexts for race, national origin, and religious discrimination.

## C.     Damages

68.     The damages under the Section 1981 and Title VII consist of back-pay, front-pay (or reinstatement), compensatory damages, punitive damages, attorneys' fees, and costs.  Each component is explained below.

69.     <u>Back-pay</u>.  Prevailing claimants under the anti-discrimination laws may recover lost back-pay and benefits.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013).  The purpose of back pay is to "make whole the injured party by placing that individual in the position

he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

70.     Front-pay.   "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).   Regarding the calculation of front-pay, the Fifth Circuit has stated that "[f]ront pay is . . . calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages."   *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)).   *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

71.     Compensatory Damages.   Mr. Ali has suffered future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, for which he seeks recovery in this lawsuit under Section 1981 and Title VII.   *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (affirming $150,000.00 compensatory damages award under Section 1981 where the plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1) (providing for compensatory damages for such harms under Title VII).

72.     Punitive Damages.   Accenture acted with malice and reckless indifference to Mr. Ali's federally protected civil rights, thus justifying awards of punitive damages under Section 1981 and the Title VII.   *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00 punitive damages awards to each plaintiff under Section 1981, even though each plaintiff was awarded only $1.00 in actual damages, and strongly

suggesting that any punitive damages award up to $300,000.00 per plaintiff would have been appropriate even in the absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256 (D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981 race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the discrimination is shown to be with "malice or reckless indifference").   In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless indifference" requirement, the plaintiff does not have to prove that the violation was egregious or outrageous.  *Id*. at 535-36. Rather, all that is required is proof that the employer knew that it was acting in the face of a perceived risk that its actions were in violation of the law's prohibition of age discrimination.  *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir. 2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original).

73.     Attorneys' fees.   Attorneys' fees are recoverable to a prevailing plaintiff under Section 1981 and Title VII.  *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff discrimination case tried in Houston $336,010.50 in attorneys' fees).

74.     As explained in detail above, the unlawful discrimination has caused Mr. Ali significant economic harm – in the neighborhood of seven-figures – in economic damages alone to date, plus emotional distress.

**D.      Exhaustion of Mr. Ali's Title VII Claims**

75.      Mr. Ali's claims for race discrimination are based on 42 U.S.C. § 1981.  Section 1981 claims have no exhaustion requirement.  *See Williams v. E.I. du Pont de Nemours*, 154 F. Supp. 3d 407, 420 (M.D. La. 2015).  Mr. Ali's Section 1981 race discrimination claims are subject to a four-year statute of limitations.  *See, e.g., White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292 (4th Cir. 2004) ("[C]laims of discrimination in compensation [under § 1981] arise under the 1991 amendments" and thus, are subject to the four-year statute of limitations.).

76.      Mr. Ali's claims for national origin discrimination and religious discrimination are based on Title VII.  Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue.  *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996).

77.      Regarding the first requirement, Mr. Ali filed his EEOC Charge on January 12, 2017, which means that any adverse action occurring within 300 days before that date (*i.e.*, March 18, 2016) is actionable under Title VII.  Regarding the second requirement, Mr. Ali received a statutory right to sue letter from the EEOC that was sent to him on July 21, 2017, and he timely filed this suit after receiving the letter.  Accordingly, Mr. Ali has exhausted his administrative remedies under the Title VII.

<u>**JURY DEMAND**</u>

78.      Mr. Ali demands a jury trial.

<u>**PRAYER**</u>

Mr. Ali asks that he be awarded a judgment against Accenture for the following:

a.      Actual damages including but not limited to pecuniary losses, non-pecuniary losses, back-pay, and front-pay;

b.      Compensatory damages;

c.      Punitive damages;

d.      Prejudgment and post-judgment interest;

e.      Attorneys' fees and court costs; and

f.      All other relief to which Plaintiff is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:    s/ Mark J. Oberti
Mark J. Oberti
State Bar No. 00789951
S.D. Texas No. 17918
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3555 – Telephone
(713) 401-3547 – Facsimile
mark@osattorneys.com – Email

ATTORNEY-IN-CHARGE FOR PLAINTIFF

OF COUNSEL:

Edwin Sullivan
State Bar No. 24003024
S.D. Texas No. 24524
OBERTI SULLIVAN LLP
712 Main Street, Suite 900
Houston, TX 77002
ed@osattorneys.com – Email

ATTORNEYS FOR PLAINTIFF

| DESCRIPTION OF EXHIBITS TO FIRST AMENDED COMPLAINT | EXHIBIT |
|---|---|
| Texts between Sam Paul and Mohammad N. Ali | 1 |
| E-mail from Mohammad N. Ali to Sam Paul of August 30, 2016 | 2 |
| Targeted Offering Created by Mohammad N. Ali on Accenture's External Website | 3 |
| E-mail Chain Involving Tony Erickson, Drew Wallace, and Nasir Ali from November 8, 2016 | 4 |
| Bob Jordan Statement | 5 |
| Jurgen Jurss Statement | 6 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was served to all counsel of record, as listed below, by ECF, on this the 19th day of December 2017.

Jacqueline Ferrell
Winston & Strawn LLP
100 N. Tyron Street, 29th Floor
Charlotte, North Carolina 28202

Erin C. Villaseñor
Winston & Strawn LLP
1111 Louisiana St., 25th Floor
Houston, TX 77002

Michael S. Roche
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601

s/Mark J. Oberti
Mark J. Oberti

### AFFIDAVIT OF MOHAMMED N. ALI

STATE OF T E X A S      §
                            §
COUNTY OF HARRIS      §

On this day, Mohammed N. Ali appeared before me, the undersigned authority, who upon his oath, deposes and states:

1.  I am over the age of 21, competent to make this affidavit, and have personal knowledge that everything stated herein is true and correct. I have read Plaintiff's Sworn Original Complaint in this case. Unless otherwise indicated as being on "information and belief," the factual statements under the heading "Factual Background" in Plaintiff's Sworn First Amended Complaint in this case are all true and correct on my personal knowledge.

2.  The exhibits attached to Plaintiff's Sworn First Amended Complaint are true and correct copies of the originals.

3.  Further, Affiant sayeth naught.

_____
MOHAMMED N. ALI

SUBSCRIBED AND SWORN TO before me on this the 18th day of December 2017, certify which witness my hand and seal of office.

ANGELA S. CLARK
NOTARY PUBLIC-STATE OF TEXAS
COMM. EXP. 05-20-2019
NOTARY ID 1007604-4

_____
Notary Public in and for
The State of TEXAS
Printed name: Angela S. Clark